# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAFAYETTE DIVISION

**NICOLE ROBERSON**                      **CIVIL ACTION NO. 6:19-CV-00067**

**VERSUS**                               **JUDGE TERRY A. DOUGHTY**

**IBERIA COMPREHENSIVE**                 **MAG. JUDGE CAROL B. WHITEHURST**
**COMMUNITY HEALTH CENTER,**
**INC.**

## RULING

Plaintiff Nicole Roberson ("Roberson") makes two claims in this action against her former employer, Defendant Iberia Comprehensive Community Health Center, Inc. ("Iberia Comprehensive"): (1) Iberia Comprehensive terminated her because of her actual disability, manic bipolar disorder and schizophrenic psychosis, in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Louisiana Employment Discrimination Law ("LEDL"), LA. REV. STAT. § 23:323; and, (2) Iberia Comprehensive interfered with and retaliated against her for attempting to take a protected medical leave in violation of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*.

Pending here is Iberia Comprehensive's Motion for Summary Judgment [Doc. No. 25] seeking dismissal of Roberson's claims.  Roberson has filed an opposition [Doc. No. 27].  Iberia Comprehensive has filed a reply to the opposition [Doc. No. 28].

For the following reasons, the Motion for Summary Judgment is **GRANTED.**

## I.      FACTS

Iberia Comprehensive is a non-profit, federally qualified health center providing a wide range of healthcare services at facilities located in Acadiana. Roberson began working for Iberia Comprehensive in July 1997, and, as of December 2017, she was working as Iberia Comprehensive's Health Information Manager.  Roberson reported directly to Iberia Comprehensive's CEO, Roderick Campbell ("Campbell"), and was considered a part of senior management.  Prior to December 2017, when the events occurred that led to her separation, she was a good, above-average worker. [Campbell Deposition, Doc. No. 25-4, pp. 20, 41, 43, 45, 55-57.]

Throughout the course of her employment, Roberson received Iberia Comprehensive's Handbooks; as a manager, she was responsible for knowing and enforcing the Handbook provisions.  [Roberson Deposition, Doc. No. 25-3, pp. 39-40].  Iberia Comprehensive's Handbook contains policies prohibiting discrimination because of an employee's disability; outlining Iberia Comprehensive's duties under the ADA; providing for FMLA leaves; explaining the expected standards of employee conduct, including the expectation that employee act professionally and with respect; and providing for termination of employment for violation of policies. [Doc. No. 25-5].

### A.      Roberson's Medical Issues and Leaves of Absence Before December 2017

Prior to December 2017, Roberson took several medical leaves of absences. In 2015, Roberson took a two-month medical leave due to surgery.  [Doc. No. 25-3, pp. 60-62]. In June 2016, Roberson took medical leave again, but the exact dates and whether it was one extended leave or intermittent leave is unclear. [*Id.*, pp. 65-67, 71, 77-79] Roberson testified it was during this medical leave that she was first diagnosed with Manic Bipolar Disorder. [*Id.*, pp. 48, 50].

During the summer of 2016, her husband involuntarily committed her to the hospital on two separate occasions pursuant to PECs (Physician Emergency Certificates) which Roberson defines as what is "issued when the physician feel [sic] that you're at danger to yourself or others." [*Id*., 55-56.]

During this leave, Iberia Comprehensive's Human Resources Manager Tamekia Livingston-Willis ("Livingston-Willis") sent Roberson a letter offering her FMLA-protected leave because, by that time, she had exhausted all of her accrued vacation and sick leave. Livingston-Willis also sent Roberson the FMLA medical certification to be completed by Roberson's treating healthcare provider. [*Id*., pp 70,71]. Roberson did not complete or submit the FMLA paperwork; instead, she returned to work, providing Iberia Comprehensive with a release dated September 19, 2016, from her general practitioner, Dr. LeBean. [*Id*., pp 70-76]. The release did not contain a diagnosis; it appeared the release was related to a physical injury or illness that involved Roberson's inability to lift heavy objects. The release did not indicate Roberson was hospitalized for her mental condition. [Doc. No. 25-9]

Roberson contends that, after receiving the FMLA paperwork, she spoke to Campbell, and he advised her that if she wanted to keep her job, she would need to return to work. [Roberson Declaration, Doc. No. 27-2, ¶ 21-22] As a result of Campbell's comments, Roberson states she did not complete the FMLA paperwork; instead, she returned to work without taking FMLA leave. [*Id*.] Campbell denies telling her this. [Doc. No. 28-2, p.3].

**B      Events Occurring in December 2017 Leading to Roberson's Separation**

Roberson continued working at Iberia Comprehensive through December 2017. According to Campbell, prior to December 2017, Roberson expressed to Campbell that she was interested in resigning from Iberia Comprehensive and taking a consulting job in Texas. They agreed that, if

3

she had an opportunity in Texas and could not give Iberia Comprehensive two weeks' notice, they would work it out. [Doc. No. 25-4, pp. 147-148].  Roberson denies telling Campbell she was interested in resigning.  [Doc. No. 27-1, p. 10].  Iberia Comprehensive's policy requests (but does not require) two weeks' notice and the CEO may accept a resignation effective immediately without penalty to the employee. [Doc. No. 25-5].

As of mid-December 2017, Roberson described her work as stressful and demanding, in part because she was assisting Campbell with an important grant application due on Wednesday, December 13, 2017. [Doc. No. 25-3, pp. 79, 84-85]. Roberson does not recall whether she was taking her medications to control her mental illness in December 2017, but she stated, "the manic, the condition was coming up -- coming up on me because it's a lot of things in that time I don't recall." [*Id.*, p. 80].

1.    **Thursday, December 14, 2017**

Beginning on Thursday, December 14, 2017, Roberson had several interactions with Director of Nursing Patrina Rogers ("Rogers"). Although Roberson has little or no memory of the incidents [*Id.*, pp. 102-103], Rogers made a contemporaneous report of the incidents. [*Id.*, p. 102; Doc. No. 25-11]

Roberson contacted Rogers and asked her for a ride to Iberia Comprehensive's St. Martinville location that morning; Rogers agreed. [Doc. No. 25-11].  Later that morning, Roberson and Rogers left the St. Martinville location, presumably to travel to Iberia Comprehensive's Lafayette site; however, instead of driving to Iberia Comprehensive's Lafayette site, Roberson directed Rogers to drive Roberson to various locations around Lafayette, St. Martinville, and New Iberia, including to her daughter's school, to a Candlewood Suites hotel,  and to her attorney's office. [*Id.*]

4

At her attorney's office, Roberson's husband appeared in the parking lot, and Rogers became very frightened he would become violent (stating, "I was afraid he was going to shoot me"). [*Id.*] Rogers felt as though she was in the middle of a domestic dispute between the Robersons and she was "going to die" when Roberson's husband approached her car. [*Id.*] Rogers felt "something was just not right" about the situation and she "did not want to be involved" in it. [*Id.*]

Aside from being fearful of the Robersons, Rogers also felt she was going to be "fired, that [her] job was on the line" because she was missing work.[*Id.*] Roberson repeatedly assured Rogers that Rogers' direct supervisor, Dr. Ramsey, was aware of the situation and had approved of Rogers being away from the office. [*Id.*] In fact, that was not the case and, instead, Dr. Ramsey and other Iberia Comprehensive personnel began calling Rogers to determine her whereabouts; they were worried because she was missing from work. [*Id.*] Campbell became aware of the situation and felt that Roberson was violating policy by placing Rogers' life at risk and by taking Rogers away from work to drive her around town without authority or permission of Rogers' supervisor. [Campbell Deposition, Doc. No. 25-4, pp. 133-140].  After Roberson left, Rogers sat in her car and talked to HR because "I was extremely upset at this point." [Doc. No. 25-11].  Roberson called her twice later that night, at about 8:30 p.m. and 10:30 p.m.; Rogers did not answer her phone. [*Id.*]

Roberson has no recollection of the specifics of these events other than being in the car with Rogers, and, she states her husband later told her the places she went. [Roberson Deposition, Doc. No. 25-3, pp. 111-114].

## 2.    Friday, December 15, 2017

The following morning, Rogers called Roberson to tell her she was bringing Roberson's

laptop (which Roberson had left in her vehicle) to work. Roberson stated she was not coming to work and that she had decided she would resign on December 31, 2017, to be a stay-at-home mom. [Doc. No. 25-11].  Roberson began to speak about various co-workers at Iberia Comprehensive "in an accusatory, expletive fashion." [*Id.*] Although Roberson has no memory of what she said and therefore cannot deny it, Roberson indicates that she would not have said those things. [Doc. No. 25-3, p. 106; Doc. No. 27-1, p. 14].

Later that same day, beginning at 4:47 p.m., Roberson sent several text messages to Campbell; Roberson has no memory of sending these text messages. [*Id*, p. 15].   Roberson's first text message to Campbell asked him to call her; Campbell responded by stating "in the woods hunting this weekend. Take care." [Doc. No. 25-12]

In her second text message, Roberson wrote:

> . . . **I want to talk to you about my resignation**. Be safe I love you and thanks for all your support. . . . Thanks to Human Resources she violated Hippa but because she is beautiful no one knows all the dirt and all the confidential information. I tried to tell you but warn you but you could not see past her attractiveness. I am so disappointed in you. I took you like my brother. You were my hero. I thought you only so the best in me when everyone else around me saw the worst. The proof was in the pudding but I believed in you. Because of who you were when I first met you. You and Melissa betrayed me and always cost me my life and Hailey'a (sic) life.

[Doc. No. 25-12] (emphasis added); *see also* [Doc. No. 25-3, pp 89-90, 93].  Iberia Comprehensive states that this text message establishes Roberson was resigning her employment, which was not unexpected because she had previously spoken to Campbell about resigning. In this text message she also accused HR Manager Livingston-Willis of violating HIPAA; stated she was "disappointed" in Campbell; and accused Campbell of "betray[ing]" her and almost costing her life and her daughter's life.

Campbell responded to this text message by stating:

6

> Not sure what you are talking about and under the circumstances
> you will need to contact me only during working hours and please
> put your wishes in writing. I pray that whatever is weighing on you
> is lifted and you have a great life. Please contact HR on Monday
> evening or upon your return. Thank you.

[Doc. No. 25-12].  Iberia Comprehensive asserts that it was clear from Campbell's response that

he did not want to receive any further texts from Roberson, and, he expected her to go through

Human Resources if she had any issues.

Roberson did not contact Human Resources as instructed. [Doc. No. 25-3, p. 158].  Instead,

she continued to text Campbell. In one text she referred to Campbell as a "hoe;" accused him of

"F***ing" various employees and "lusting" over the HR Manager; referred to the HR Manager as

a "dirty bitch" and herself as a "Brilliant Bitch with a saving grace;" accused Campbell of "sleeping

with" the Board President of Iberia Comprehensive, whom she also called a "side hoe;" and

referred to another former coworker as "the biggest slut." She also stated, "Change your life and

ask for forgiveness because the end is near." [Doc. No. 25-3, p. 94-97, Doc. No. 25-4, pp. 104-

109; Doc. No. 25-12].

Campbell testified the allegations of sexual relationships were untrue and that he found the

text "very hurtful" and "very disrespectful." [Doc. No. 25-4, pp. 105-106, 108, 141, 150].

Roberson admits her language in this text message was in violation of Iberia Comprehensive's

conduct policy and not professional behavior expected of a senior manager. [Doc. No. 25-3, pp.

95-97].

Again, Roberson does not recall the circumstances surrounding sending this or any other

text message during this time period and has no memory of sending these text messages. [Doc.

No. 25-3, pp. 81-84, 99]

After receiving this text message, Campbell blocked Roberson's number because he

thought she was misusing the company's equipment and violating policy, he did not want it to continue, and he found the text messages "very hurtful" and "very disrespectful." [Doc. No. 25-4, pp. 141, 150] As the CEO, Campbell did not think that employees should send him text messages of that nature just as he wouldn't send that type of text message to employees. [Id. p. 151].

### 3.    Saturday, December 16, 2017

Roberson attempted to send another text message to Campbell on Saturday, December 16, 2017, at 4:23 p.m., stating she would be taking medical leave starting the following day. [Roberson Deposition, Doc. No. 25-3, p. 98, Doc. No. 25-12]. The text message does not show that it was delivered to Campbell, and Roberson received no confirmation and does not know whether he received it, although she states that since he received her texts the previous day, she "assumes" he received this one. [Roberson Deposition, Doc. No. 25-3, p. 98.; Doc. No. 27, p. 23]. However, in her Statement of Contested Material Facts Presenting a Genuine Issue, Roberson does not contest Iberia Comprehensive's contention that Campbell never received the text message because he had already blocked Roberson's number from his phone, and that the first time Campbell saw the text was when it was produced by Roberson in this litigation. [Doc. No. 27-1, p. 19]. Roberson also does not dispute that, even if Campbell had seen this text, he would not have approved her leave because she had been terminated for her conduct. [Id.; Doc. No. 25-4, pp. 126-127]

Roberson also called Rogers on the evening of December 16, 2017, stating the purpose of the call was to obtain Human Resources Manager Livingston-Willis' telephone number. [Doc. No. 25-11]. During this call, Roberson was "screaming" and using "expletive[s]," stating Livingston-Willis was the "reason her child wants to kill herself," and making threats to physically "beat" Livingston-Willis. [Id.]   During this call, Roberson repeatedly threatened to kill herself, articulating with detail her plan for her daughter after her death. [Id.]  Roberson does not contest

this.  [Doc. No. 27-1, p. 20].

### 4.     Sunday, December 17, 2017

At some point on either Saturday, December 16, 2017, or Sunday, December 17, 2017, while at the Candlewood Suites, Roberson reported there was an "active shooter" at the hotel. [Roberson Deposition, Doc. No. 25-3, pp. 114, 118].  Thereafter, Roberson was transported to and treated at Our Lady of Lourdes Emergency Room, where she was caustic to the physicians and staff, i.e., screaming, cursing, and making physical threats of violence. [*Id*., pp. 115-116] Roberson states she believes that that would have been her behavior, but she does not remember what happened.  [*Id*.; Doc. No. 27-1, p. 21].  Roberson was released from Our Lady of Lourdes that night and returned home. [Roberson Deposition, Doc. No. 25-3, pp. 118-119].

### 5.     Monday, December 18, 2017

Monday morning, Roberson called Iberia Comprehensive's Pharmacy Director, Reginald Boutte ("Boutte"), purportedly to warn him of an impending investigation. Roberson does not recall this conversation. [*Id*., pp. 120-122]. During that call, Roberson told Boutte that Campbell was having inappropriate sexual relationships with various employees and the Board President; she referred to Campbell as a "hoe;" she used profanity concerning Campbell; she stated Campbell would be terminated and she would become the new CEO; and, she encouraged Boutte to leave the facility and to go work for another healthcare facility in Houston. [Doc. No. 25-14].[1]

Later that day, Roberson was transported to Lafayette General Hospital by ambulance and was involuntarily committed and transferred to Vermilion Hospital. [Roberson Deposition, Doc.

---

1 Although this statement in not in admissible form, the Court may consider it if the statement could be reduced to admissible evidence at trial or reduced to admissible form. *Lee v. Offshore Logistical and Transport, LLC*, 859 Fed. 3d 353 (5th Cir. 2017).   Here, Boutte could be called as a witness at trial; additionally Roberson cannot contest the statement.

No. 25-3, pp. 119, 121]

### C.    Roberson's Resignation/Termination

Campbell understood and considered Roberson's December 15th text messages as indicating her intent to resign [Campbell Deposition, Doc. No. 25-4, pp. 35, 98, 120-122]. Campbell sent Roberson a letter dated December 19, 2017, accepting her resignation. [Doc. No. 25-15]. Roberson did not immediately receive the letter because, unbeknownst to Campbell, she was hospitalized. [Doc. No. 25-4, p. 120].  Roberson responded by letter dated December 29, 2017, which she describes as an attempt to "undo" her resignation and be placed on medical leave. [Doc. No. 27-1, p. 23]. She stated in this letter that she had an "inpatient stay" from December 19 through December 25, 2017, and that she intended to take medical leave from December 25, 2017, through January 15, 2018, [Doc. No. 25-16; Doc. No. 27-1, p. 23].

Campbell sent a written response to the letter, indicating that he understood her text message as a resignation, he allowed her to resign out of courtesy, but if she withdrew her resignation, she would be involuntarily terminated for violation of company policy, including making threats against coworkers, insubordination, abusive behavior, breaking the chain of command, and using vulgar and obscene language. [Doc. No. 25-17; Campbell Deposition, Doc. No. 25-4, pp. 124-125].

Roberson understood that she was being allowed to resign in lieu of termination due to her long tenure at Iberia Comprehensive. [Roberson Deposition, Doc. No. 25-3, p. 136].

Both Roberson and Campbell brought the issue of Roberson's termination to Iberia Comprehensive's Board of Directors, which, in turn, had the issue investigated. [Roberson Deposition, Doc. No. 25-3, pp. 136-137; Campbell Deposition, Doc. No. 25-4, pp. 145-146]. Following the investigation, the Board of Directors decided not to reinstate Roberson. [Campbell

Deposition, Doc. No. 25-4, 146].

Roberson filed an EEOC charge, and this lawsuit followed.

Iberia Comprehensive contends it is entitled to judgment as a matter of law dismissing Roberson's disability discrimination claim because it is undisputed that Roberson's unprofessional and disruptive conduct, including threats made against Iberia Comprehensive's Human Resources Manager and the use of profanity directed to Campbell, violated Iberia Comprehensive's policies and was not the type of professional conduct befitting her position in senior management. Thus, Iberia Comprehensive decided to accept Roberson's resignation, or, alternatively, to terminate Roberson. Iberia Comprehensive asserts its termination of Roberson was not discriminatory under the ADA or the LEDL because, as Roberson readily admits, any employee demonstrating this type of conduct would be similarly terminated.

Iberia Comprehensive further contends that Roberson did not request FMLA medical leave in December 2017. However, even if she had requested protected medical leave, Iberia Comprehensive states it would have taken the same action in terminating her based on her violation of conduct rules. Iberia Comprehensive asserts Roberson's termination was due to legitimate, nondiscriminatory and nonretaliatory reasons, and was not motivated to deprive, interfere with, or retaliate because of Roberson's protected FMLA leave.

Roberson responds that Iberia Comprehensive violated the ADA by terminating Roberson, when her behavior was caused by her mental disability. She further responds that Iberia Comprehensive interfered with her FMLA rights in September 2016 and again in December 2017, and then retaliated against her for seeking to exercise her FMLA rights, by terminating her employment.

The motion is fully briefed, and the Court is prepared to rule.

11

## II.   LAW AND ANALYSIS

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ).   A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994).  In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.  However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

12

### B.   Disability Discrimination Claim

Roberson alleges her termination violates the ADA and the LEDL. "The ADA is a federal anti-discrimination statute designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities." *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 161 (5th Cir. 1996). Pursuant to the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

Louisiana's version of the ADA, the LEDL, provides that an employer cannot "[d]ischarge or otherwise discriminate against an otherwise qualified disabled person with respect to compensation or the terms, conditions, or privileges of employment on the basis of a disability when it is unrelated to the individual's ability to perform the duties of a particular job or position." LA. REV. STAT. § 23:323(B)(2). Both the ADA and LEDL employ similar language, and the United States Court of Appeals for the Fifth Circuit has held that when interpreting Louisiana's anti-discrimination laws, it looks to federal employment discrimination jurisprudence. *Baker v. FedEx Ground Package Sys., Inc.,* 278 Fed. Appx. 322, 328 (5th Cir. 2008).

In a termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability, or, alternatively, proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Title VII case. *See Benson v. Tyson Foods, Inc.,* 2016 WL3617803 at*6 (E.D. Tex. July 6, 2016) (citing *EEOC v. LHC Group, Inc.,* 773 F.3d 688, 694 (5th Cir. 2014); *see also EEOC v. Chevon Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009)).

13

Direct evidence "is evidence that if believed, proves the facts of discriminatory animus without inference or presumption." *Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 310 n.6 (5th Cir. 2004).

Absent direct evidence of discrimination, a plaintiff must make a prima facie case of discrimination by showing she (1) has a disability, was regarded as disabled, or has a record of a disability; (2) was qualified for the job; and (3) was subjected to an adverse employment decision on account of her disability. *Cannon v. Jacobs Field Services North America, Inc.,* 813 F. 3d 586, 590 (5th Cir. 2016) (citing *LHC Grp.,* 773 F.3d at 697).  "If [s]he makes that showing, a presumption of discrimination arises, and the employer must 'articulate a legitimate non-discriminatory reason for the adverse employment action.'" *Id.* at 590 (quoting *Chevron Phillips,* 570 F.3d at 615). "The burden then shifts to the plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.* (citing *Chevron Phillips,* 570 F3d. at 615.)

To establish her claim of disability discrimination, Roberson must prove her mental illness was a "motivating factor" in her termination.  *See Maples v. University of Texas Medical Branch at Galveston*, 524 Fed. App'x. 93, 95 (5th Cir. 2013) ("Under the ADA, 'discrimination need not be the sole reason for the adverse employment decision, [but] must actually play a role in the employer's decision-making process and have a determinative influence on the outcome.'); *see also Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 503 (5th Cir. 2002) (*quoting Ahrens v. Perot Sys. Corp*., 205 F.3d 831, 835 (5th Cir. 2000)).

### 1.   *Prima facie* case

There is no direct evidence of disability discrimination in this case, so the *McDonnell Douglas* burden-shifting analysis applies.  Here, for the purposes of summary judgment, Iberia

14

Comprehensive does not dispute that Roberson had an actual disability, manic bipolar disorder and schizophrenic psychosis, or that Iberia Comprehensive had knowledge of Roberson's disability. Likewise, Iberia Comprehensive does not dispute that Roberson was "qualified" for and performing in the job of Health Information Manager at least until December 2017.  Further, it is undisputed that Roberson suffered an adverse employment action--she was terminated.  The issue then becomes whether the third prong has been satisfied, i.e, has Roberson established a *prima facie* case by showing that she was subjected to an adverse employment decision *on account of her disability*.

Iberia Comprehensive argues that the evidence demonstrates that Roberson resigned and/or was terminated because of her threatening, profane, and unprofessional conduct.  Roberson responds that she did not resign, and, that her behavior, which admittedly violated company policies, was caused by her disability.

The Court finds that, even viewing the evidence in the light most favorable to Roberson, she has not met her burden of showing she was subjected to an adverse employment decision on account of her disability.  First, she has failed to raise a genuine issue of material fact for trial that her termination was not the result of her resignation statements to Campbell.  Roberson disputes Campbell's testimony that she told him that she was interested in resigning from Iberia Comprehensive and taking a consulting job in Texas, and she claims she would not have told Rogers she was resigning on December 31, 2017, to be a stay-at-home mom.  However, she nevertheless does not dispute that she sent the resignation text to Campbell, that he construed it to be her resignation, and that he accepted her resignation.  She implicitly acknowledges that she did resign by stating that she sent a letter seeking to "undo" her resignation.  [Doc. No. 27-1, p. 23].

15

Secondly, she has not shown that her termination did not come about because of her threatening, profane, and unprofessional conduct.  She does not dispute that she engaged in the behavior outlined above; she merely asserts her behavior was caused by her disability.  Although her burden of proof in establishing a *prima facie* case is minimal, the Court finds that she has not met that threshold.   For these reasons, Iberia Comprehensive is entitled to summary judgment on Roberson's ADA and LEDL claims**.**

However, assuming *arguendo* that Roberson has established a *prima facie* case of discrimination based on disability, the Court will next consider whether Iberia Comprehensive has articulated "a legitimate non-discriminatory reason for the adverse employment action."

### 2.      Legitimate non-discriminatory reasons for termination

Iberia Comprehensive argues that it has clearly articulated its legitimate, non-discriminatory reason for its decision to accept Roberson's resignation, or, alternatively, to terminate Roberson for her conduct. First, it is uncontested that Campbell, Roberson's direct supervisor and the decision maker in this case, considered Roberson's text message as her intent to resign her employment.  However, even if she had not resigned, Iberia Comprehensive submits it would have terminated Roberson because of her abusive and threatening language, her inappropriate and offensive text messages, and her actions involving Rogers—all of which violated Iberia Comprehensive's conduct and discipline policies.

Iberia Comprehensive submits that even Roberson concedes that her conduct between December 14 and 18, 2017 was unacceptable—she admits that her offensive and inappropriate language in the text messages, threats made against Iberia Comprehensive's Human Resources Manager and her other behavior violated the policies and expectations of Iberia Comprehensive.

Iberia Comprehensive further asserts that Roberson's attempts to excuse her conduct by arguing that it was caused by her mental illness are of no avail because the ADA and the LEDL do not protect abusive, offensive conduct from termination.  Iberia Comprehensive argues that courts presented with this issue have uniformly held that an employer does not violate the ADA or otherwise discriminate against an employee by terminating an employee who violates the employer's conduct rules, even if the violation is caused by a mental disability.

As an example, Iberia Comprehensive points to the Fifth Circuit case of *Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047 (5th Cir. 1998). In *Hamilton*, the Plaintiff-employee was suffering from depression and Post Traumatic Stress Disorder ("PTSD") when he was fired after a heated, profanity-ridden encounter with a coworker. In granting summary judgment in favor of the employer, the Court held that, assuming Plaintiff's mental impairment was a disability, he was not terminated because of the disability, but rather because he violated a workplace policy, i.e., the "abusive harangue" to a coworker in which he yelled and called the co-worker a "f---ing bitch!" Plaintiff argued the incident was caused by his PTSD, but the Fifth Circuit rejected that argument, holding, "the ADA does not insulate emotional or violent outbursts blamed on an impairment. An employee who is fired because of outbursts at work directed at fellow employees has no ADA claim." *Id.,* at 1052.  Further, the Court noted: "The cause of [Plaintiff's] discharge was not discrimination based on PTSD but was rather his failure to recognize the acceptable limits of behavior in a workplace environment. The nature of the incident, shown by the record, presents a clear case in which [Plaintiff] was fired for his misconduct in the workplace. . . . Plaintiff cannot hide behind the ADA and avoid accountability for his actions." *Id. See also, Seaman v. CSPH, Inc*., 179 F.3d 297 (5th Cir. 1999) (affirming summary judgment on employee's ADA claim holding employee who was allegedly bipolar was terminated for insubordination to

his supervisor and stating Plaintiff "cannot use the ADA as an aegis and thus avoid accountability for his own actions.")

Iberia Comprehensive additionally argues that the District Courts within the Fifth Circuit have likewise followed *Hamilton*'s holding. *See Leal v. Sinclair Broadcasting Group*, No. A-16-CV-679, 2018 WL 6172526, at *9 (W.D. Tex. Nov. 26, 2018) (granting summary judgment on ADA claim and finding Plaintiff was not a "qualified individual" because he made threatening statements, even when Plaintiff claimed those statements were caused by his nervous breakdown); *Johnson v. Parkwood Behavioral Health System*, No. 2:11CV212-SA-SAA, 2013 WL 1827585, at *4 (N.D. Miss. April 30, 2013) (affirming summary judgment on an ADA claim brought by bipolar employee holding, "The ADA does not prohibit adverse action due to a consequence of a disability. . . The ADA does not insulate an employee from adverse action taken by an employer because of misconduct in the workplace, even if his improper behavior is arguably attributable to an impairment."); *Necaise v. Grand Casinos of Miss., Inc.—Biloxi*, No1:04CV126, 2006 WL 3469604, at *2  (S.D. Miss. Nov. 30, 2006) (dismissing employee's ADA claim on summary judgment).

Further, Louisiana courts have adopted *Hamilton* in the context of claims under the LEDL. *See Lindsey v. Foti*, 2011-0426, p. 8 (La. App. 1 Cir. 11/9/11); 81 So.3d 41, 46 (affirming summary judgment and holding employee with PTSD who was terminated for using profanity and making a threatening statement regarding a co-worker could not maintain a state law disability discrimination claim). In *Lindsay*, the Court stated:

> Although [Plaintiff] argues that his conduct was caused by his disability and therefore the adverse employment action was taken because of his disability, the LEDL does not provide protection for [Plaintiff's] unacceptable and threatening conduct. The first circuit has adopted the position that our antidiscrimination law does not insulate an employee's emotional outbursts at work blamed on an impairment. . . . After a thorough

> *de novo* review of the record, we conclude that the basis of [Plaintiff's] discharge was not discrimination based on his PTSD, but was rather his inappropriate and hostile behavior in a workplace environment. . . . Louisiana's antidiscrimination law is not a job insurance policy, but rather a legislative scheme for correcting illegitimate inequities faced by the disabled. An employer must be permitted to terminate its employee on account of egregious misconduct, irrespective of whether the employee is disabled. The act cannot be interpreted to require an employer to accept egregious behavior by a disabled employee when that same behavior, exhibited by a nondisabled employee would require termination. Thus, firing an employee for conduct caused by his disability is not the equivalent of firing the employee for the disability.

> *Id.*

Additionally, "[a] survey of federal case law supports [the] argument that a disabled person can be lawfully terminated for disability related misconduct—so long as the employer's explanation is not a pretext for discrimination." *Walton v. Spherion Staffing*, *LLC*, 152 F.Supp.3d 403 (E.D. Pa. 2015) (citing supporting cases from the First, Third, Fourth, Eighth, Ninth and Tenth Circuits); *see also, Darcangelo v. Verizon Md., Inc.*, 189 Fed. Appx. 217, 219 (4th Cir. 2006) (" . . . the ADA does not require [defendant's] to subject its employees to [plaintiff's] abusive behavior, which, not surprisingly, created considerable anxiety within her work environment, even if that behavior was related to her bipolar disorder."); *Valentine v. Standard  & Poor's*, 50 F.Supp.2d 262, 289 (S.D.N.Y. 1999) (holding "whether [Plaintiff's] misconduct was a manifestation of his disability [bipolar disorder] is immaterial because the ADA does not immunize disabled employees from discipline or discharge for incidents of misconduct in the workplace."); *Husowitz v. Runyon*, 942 F.Supp. 822, 834 (E.D.N.Y. 1996) (judgment for employer based on evidence that Plaintiff, diagnosed with bipolar affective disorder, was uncooperative, disruptive, and "engaged in threatening conduct with his co-workers").

Iberia Comprehensive argues that the EEOC also makes it clear that an employer may discipline an employee who, because of a disability, violated a conduct rule. The EEOC has

included this in its guidance. See 2008 Enforcement Guidance, *The Americans With Disabilities Act: Applying Performance and Conduct Standards to Employees with Disabilities*, at Example 9; *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act*, 2002 WL 31994335, at * 25 (October 17, 2002); *Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities*, 1197 WL 34622315, at * 14, 16 (March 25, 1997).

Roberson responds that the central issue here is whether Iberia Comprehensive violated the ADA and the LEDL by terminating Roberson, who admittedly violated company policies, when the violation *was caused by her mental disability.* She contends that the cases cited by Iberia Comprehensive predicate their holdings on *violence* (or *threats of violence*) directed at fellow employees within a workplace. *See, e.g., Hamilton,* 136 F.3d at 1052 (employee used expletives in a face-to-face encounter with a coworker); *Darcangelo v. Verizon Maryland, Inc*., 189 F. App'x 217, 218 (4th Cir. 2006) (employee engaged in "threatening, abusive, and harassing behavior toward her co-workers and supervisors in the course of performing her duties"); *Sullivan v. River Valley Sch. Dist.,* 197 F.3d 804 (6th Cir. 1999), *cert. denied,* 530 U.S. 1262 (2000) (employee threatened school board members at a meeting); *Palmer v. Circuit Court of Cook Cty., Ill.,* 117 F.3d 351 (7th Cir. 1997), *cert. denied,* 522 U.S. 1096 (1998) (employee threatened coworker with violence and threatened to kill supervisor).

Roberson argues that her text messages do not involve or mention violence, do not include threats of violence, and were not directed at a fellow employee while at a workplace.  According to Roberson, the text messages were sent while both Roberson and Campbell were off, and the messages were not a face-to-face conversation. Finally, she argues that no one other than Campbell and Roberson had access to the messages, and the messages did not rise to the level of posing a

direct threat to the health or safety of others.

Considering all of these factors, Roberson asserts that her text messages do not fall within the general rule that "[a]n employee who is fired because of outbursts at work directed at fellow employees has no ADA claim." *Hamilton*, 136 F.3d at 1052. Roberson state her messages were not in all capital letters, which is commonly identified as yelling.   Roberson further states she simply sent messages to Campbell addressing her concerns of a HIPAA violation and her disappointment in Campbell. While Roberson used profanity within her text messages, she did not refer to Campbell in any way other than possibly being a "hoe."

Roberson additionally argues that another difference between *Hamilton* is that Roberson never physically touched anyone employed at Iberia Comprehensive. Further, a key distinction between Roberson and the plaintiff in *Leal v. Sinclair Broadcasting Group* is that the plaintiff in *Leal* wrote threatening messages on social media regarding his coworkers and managers. No. A-16-CV-679,2018 WL 6172526, at *3 (W.D. Tex. Nov. 26, 2018) These messages included actual threats and were made public; the messages were not limited to two Defendant-employees. The court found Defendant's reason for terminating Leal legitimate, as his threatening posts and attacks on the station on social media violated Defendant's policies. *Id*.at 8. As for Roberson, the text message exchange between her and Campbell was confidential and was not shared publicly. Also, Roberson's text messages did not include actual threats.

Roberson further asserts that a distinction between *Necaise v. Grand Casinos of Miss., Inc.—Biloxi,* supra, and her case is the plaintiff was terminated for insubordination in the workplace after being warned multiple times of wrongdoings. No 1:04CV126, 2006 WL 3469604, at *3 (S.D. Miss. Nov. 30, 2006) This is distinct from Roberson, as she was never reprimanded for any form of insubordination until Campbell found the December 15, 2017 texts to be a form of

insubordination, "very hurtful" and "very disrespectful."

Roberson contends her text messages were not a violent outburst, did not take place at the workplace, and were not a threat of violence. The text messages were exchanged between two senior managers, one of whom simply thought the messages were "very hurtful" based on the allegations made within the messages. These key differences, according to Roberson, show that she was qualified for her position with Defendant after December 19, 2017.

Roberson concludes that the question is whether the facts, read in the light most favorable to her, support the conclusion that she was fired because of her disability.  She contends she did not actually threaten anyone. She contends further, that even if this Court determines she made actual threats in the text messages or that Roberson was a genuine threat to anyone at Iberia Comprehensive, which Roberson contends she was not, then upon her potential return to work date, the threat would have passed. She contends she pursued treatment to control her mental illness immediately after the text messages were sent. She states that Campbell's reliance on Roberson's text messages as a reason for termination is at least partially motivated by his concerns of Roberson's disability. Having dealt with and experienced Roberson's disability in 2015 and 2016, Campbell was aware that once Roberson sought help in December of 2017 for her disability, she would be able to return to work and termination was not necessary.

The Court finds that Iberia Comprehensive has articulated legitimate, non-discriminatory reasons for Roberson's termination.  First of all, Iberia Comprehensive was justified in believing Roberson had submitted her resignation.  She admittedly sent a text message clearly stating her intent to resign.

However, assuming *arguendo*, that Iberia Comprehensive was not justified in believing Roberson had resigned, the Court additionally finds that, contrary to Roberson's arguments, her

actions constitute the type of unacceptable and threatening conduct which may serve as legitimate, non-discriminatory reasons for termination, as long as they are not pretextual.

Although all of Roberson's interactions with Rogers are disturbing, the telephone call on December 16, 2017, can certainly be deemed as unacceptable and as threatening violence toward fellow employees. Roberson was "screaming" and using "expletive[s]" stating Human Resources Manager Livingston-Willis was the "reason her child wants to kill herself," and *making threats to physically hurt* Livingston-Willis. [Doc. No. 25-11]. Roberson stated she wanted to "beat" Livingston-Willis. During this call, Roberson repeatedly *threatened to kill herself*, articulating with detail her plan for her daughter after her death.

Roberson's string of emails to Campbell at his hunting camp were also profane and threatening, particularly the email sent Friday, December 15, 2015, in which she referred to Campbell as a "hoe;" accused him of "F***ing" various employees and "lusting" over the HR Manager; referred to the HR Manager as a "dirty bitch" and herself as a "Brilliant Bitch with a saving grace;" accused Campbell of "sleeping with" the Board President of Iberia Comprehensive, whom she also called a "side hoe;" and referred to another former coworker as "the biggest slut. In that email, Roberson also threatened Campbell: "Change your life and ask for forgiveness because the end is near."

While at the Candlewood Suites, Roberson reported the existence of an "active shooter" when no such person existed.  Thereafter, Roberson was transported to and treated at Our Lady of Lourdes Emergency Room, where she was caustic to the physicians and staff, i.e., screaming, cursing, and *making physical threats of violence*.

Therefore, contrary to Roberson's representations, she did threaten violence, and her threats were made against fellow employees, both in and out of the workplace.

The Court concludes that Iberia Comprehensive has articulated legitimate, non-discriminatory reasons for Roberson's termination.  The Court will next determinate whether Roberson has carried her burden of proving pretext.

### 3.    Pretext

In order to create a genuine issue of fact on the issue of pretext, Roberson must either produce evidence establishing Iberia Comprehensive's stated reasons for its actions are unworthy of credence or false, or, evidence of disparate treatment.  Roberson has not argued or introduced any evidence of disparate treatment; however, she argues that Iberia Comprehensive's articulated legitimate, nondiscriminatory reasons were false.

Roberson attempts to establish pretext by stating, "Upon information and belief, Defendant's reasons for discharge are known to be false." [Doc. No. 27, p. 19] However, her argument, based on "information and belief," falls short of the requirement that Roberson produce actual evidence that Iberia Comprehensive's reasons for its decisions were false. Instead of producing such evidence, Roberson merely argues her conduct was not so egregious to warrant termination.

Roberson argues that there is no pre-discharge evidence to support the stated reason for discharge.  She apparently is arguing that she had never been reprimanded for violating company policies prior to December 2017.  However, the events of December 2017 which occurred *prior to* her termination are ample "pre-discharge" evidence.

Roberson further argues that most of her actions occurred on a weekend and therefore Campbell should have ignored them, as he had done previously.  She additionally argues that the idea that she was insubordinate is "nonsensical," because there is no evidence that she disobeyed any directives on a weekend when she was not working.  This argument ignores the fact that

Campbell directed her to call HR on Monday, and, when she ignored this directive, he eventually had to block her string of abusive texts. Even though this occurred on a weekend, it nevertheless demonstrated insubordination.

Roberson further argues that reliance on Rogers's account is "illogical" because Rogers returned her lap top the next day, which shows she was actually not afraid for her life, and, additionally, some of Rogers' statements are disputed by Roberson's husband.    However, a reading of Rogers' statement in full supports the conclusion that she had ample reason to fear for her life. Roberson has offered no reason why Rogers would lie about her conduct.

Roberson does not fare any better under the mixed motive theory, that is, by arguing Defendant's legitimate, non-discriminatory reason, while true, is only one of the reasons for its decision, and another "motivating factor" was her disability. Aside from her subjective belief that she should not have been terminated, which is insufficient to establish discrimination, *see Hervey v. Miss. Dept. of Educ.,* 404 Fed. Appx. 865, 870 (5th Cir. 2010) ("[S]ubjective beliefs of discrimination cannot be the basis for judicial relief."), Roberson has not introduced any evidence that her disability was a factor, much less a "motivating factor" in the decisions made by Iberia Comprehensive.

The only argument Roberson seemingly makes to this point is that Campbell knew of her disability for at least two years before her resignation/termination.  However, that fact alone, even if true, does not establish that it was a "motivating factor" to his decision to terminate her. Roberson has not submitted any evidence to suggest that Campbell had a discriminatory motive. For instance, Roberson does not allege any facts that would suggest that Campbell made any disparaging comments about Roberson's mental disability. Quite the opposite, a fair reading of Roberson's declaration and the declaration of her husband, Robert Roberson, demonstrate that

Campbell was accommodating and helpful to Roberson.  For instance, Campbell offered to write and wrote a referral for Roberson to see a psychiatric nurse practitioner, Lecy Broussard. [Doc. No. 27-1, p. 9, ¶ 27; Doc. No. 27-2, p. 2, ¶ 16; Doc. No. 27-3, p. 2, ¶¶ 18-19.]

Further, Robert Roberson attested Campbell stated Roberson could take "as much time as needed despite the fact that she no longer had any sick leave time available" [Doc. No. 27-3, p. 1, ¶ 5]; agreed to reduce Roberson's workload [Doc. No.  27-3, p. 2, ¶ 18]; referred to Roberson as a "professional woman" and agreed to assist Roberson with medical leave [Rec. Doc. 27-3, p. 3, ¶¶ 20-21.]

There is nothing to suggest Campbell was motivated by animus based on Roberson's disability. The mere fact that he could not continue to tolerate or condone her conduct does not establish that Roberson's disability was a "motivating factor."

The Court finds that Roberson has not carried her burden of proving pretext. Even taking all facts in the light most favorable to Roberson, her ADA claim must fail because the overwhelming evidence indicates she was separated from Iberia Comprehensive due to her resignation and/or her conduct and violation of conduct policies.  Further, Roberson has no evidence that Iberia Comprehensive's stated reason for her separation was not legitimate; indeed, Roberson admits that she knows of no other employee who engaged in similar conduct who was not or would not be likewise terminated. [Doc. No. 27-1 ¶ 74]. Roberson cannot point to any non-disabled employee who was similarly situated, meaning they engaged in similar conduct, that was not terminated. Simply put, Roberson was not treated differently or adversely because of her disability; she was separated because her conduct was intolerable.

For these reasons, Iberia Comprehensive is entitled to summary judgment on Roberson's ADA and LEDL claims. The Court will next address Roberson's FMLA interference and

retaliation claims.

### C.   FMLA Claims

#### 1.   Interference

The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise, or attempt to exercise, of any right provided by the FMLA.  29 U.S.C. § 2615(a)(1).

To establish a prima facie interference case, Roberson must show all of the following elements: (1) she was an eligible employee, (2) her employer was subject to the FMLA's requirements, (3) she was entitled to leave, (4) she gave proper notice of her intention to take FMLA leave, (5) her employer interfered with, restrained, or denied her the benefits to which she was entitled under the FMLA, and (6) she was prejudiced thereby.  *Jiles v. Wright Med. Tech., Inc.*, 313 F.Supp.3d 822, 844 (S.D. Tex. 2018); *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017); *See Lanier v. Univ. of Texas Sw. Med. Ctr.,* 527 F. App'x 312, 316 (5th Cir. 2013); *see also Cuellar v. Keppel Amfels*, *L.L.C.,* 731 F. 3d 342, 347 (5th Cir. 2013).

The employee must point to evidence of prejudice. *Jones v. Children's Hosp.*, 58 F.Supp.3d 656, 668-69 (E.D. La. 2014). Prejudice exists when an employee loses compensation or benefits by reason of the violation or suffers some loss in employment status.  *Id.*at 669.  An interference claim does not require a showing of discriminatory intent.  *Id.*at 668.

Requesting or being on FMLA "does not insulate Plaintiff from being lawfully terminated . . . ." *Terry v. Promise Hosp. of Ascension, Inc.,* No. 13-128-SDD-RLB, 2014 WL 4161581, at * 10-11 (M.D. La. Aug. 19, 2014). Indeed, there is an "important caveat" that "an employee who requests or takes protected leave under the FMLA is not entitled to any greater rights or benefits that he would be entitled to had he not requested or taken leave." *Id. quoting Maldonado v. Frio County*, *Tex.*, No. A.SA-02-CA1046XR, 2004 WL 1304951, at * 4 (W.D.

Tex. June 1, 2004). "Therefore, an employer is entitled to dismiss an employee for any lawful reason at any time, whether before, during or after an employee requests or takes leave pursuant to the FMLA, as long as the employer does not discriminate or retaliate against the employee for requesting or taking such leave." *Id*.  "To limit an employer's ability to terminate an employee for performance issues simply because the employee requested medical leave would vest the employee with greater rights and benefits than she would have enjoyed had she continued working without requesting such leave." *Id*. (Emphasis in original.) Thus, simply because an employee requests medical leave, the employee is not entitled to be retained despite poor performance or violation of the employer's policies. *Id*

An employer may defeat a FMLA interference claim by proving that the right to FMLA leave was extinguished before the employer requested the leave. *Ralser v. Winn Dixie Stores, Inc.,* No. 13-2799, 2015 WL 5321743 at * 9 (E.D. La. Sept. 11, 2015), *citing Shirley v. Precision Castparts Corp.*, 726 F.3d 675, 682 (5th Cir. 2013). In *Ralser*, the court held the employer presented sufficient evidence to show that the Plaintiff's right to FMLA was "no longer viable" because the employer made the decision to terminate him unrelated to his FMLA leave. *Ralser*, 2015 WL 5321743, at * 10. Likewise, for the same reason, the *Ralser* court found the Defendant-employer was entitled to summary judgment on its mixed-motives defense, that is, it proved that it intended to terminate Plaintiff regardless of his request for FMLA leave. *Ralser*, 2015 WL 5321743, at * 9.

Iberia Comprehensive argues that it is entitled to judgment as a matter of law dismissing Roberson's alleged December 2017 FMLA interference claim because the evidence clearly establishes that Roberson failed to give proper notice of her intention to take FMLA leave before she was terminated.  Additionally, even if she had given proper notice, Iberia Comprehensive

separated her not because she requested or would be entitled to a FMLA leave, but rather, because she expressed the intent to resign, and, even if she had not, her conduct violated Iberia Comprehensive's conduct and discipline policies.

However, Roberson responds in her opposition that she, in fact, made *two* requests for FMLA leave. First, in September of 2016, upon her return to work after being discharged from a mental institution, Roberson asserts that she spoke to Campbell concerning her desire to take FMLA leave, and that Campbell told her that if she took FMLA leave, she would be terminated because the facility could not function without someone in her position.

Roberson asserts she requested leave a second time on December 16, 2017 when she sent the text message to Campbell stating she "will be on medical leave effective tomorrow."

The Court will address each alleged interference claim in order.

### a.      September 2016 interference claim

As indicated above, Roberson contends in her opposition that Campbell interfered with her FMLA rights in September 2016 when he allegedly discouraged her from taking FMLA leave, by telling her that, if she took FMLA leave, she would be terminated because the facility could not function without someone in her position.

Iberia Comprehensive replies that Roberson's FMLA claims are restricted to her inability to take FMLA protected leave in December 2017, as indicated by her amended Complaint [Doc. No. 7, ¶¶ 56-69].  Iberia Comprehensive asserts that, despite her arguments in her opposition, Roberson has not alleged and is not making a claim in this lawsuit that she was denied FMLA leave at any time before December 2017, and, in fact, the undisputed facts demonstrate that she took numerous leaves in 2015 and 2016, and, was restored to her job after each leave. [Doc. No. 27-1, pp. 4-5, ¶¶ 11-14; p. 25, ¶ 76].

29

Iberia Comprehensive additionally contends that Roberson's attempts to create an issue of fact fail because Roberson had already been released to return to work by her primary care physician [Doc. 27-2, p. 2, ¶¶ 14, 17, 18.25], and she returned to work at the same salary. [Rec. Doc. 25-3, pp. 32, 38-39.]

The Court does not construe Roberson's amended Complaint as making an independent FMLA claim for the September 2016 interference when Campbell allegedly discouraged her from taking FMLA leave.  Roberson's amended Complaint in its "Facts" section states:

22.

In September of 2016, Plaintiff returned to work after being discharged from a mental institution.

23.

Upon her return, Plaintiff spoke with the human resources department ("HR"), as well as Mr. Campbell, concerning her desire to take leave under the Family Medical Leave Act ("FMLA") because of her disability.

24.

However, Plaintiff was informed by Mr. Campbell that if she took FMLA leave, she would be terminated because ICCH could not function without someone in her position.

Roberson's amended Complaint in its FMLA section states:

FAMILY MEDICAL LEAVE ACT ("FMLA")

56.

All foregoing allegations are incorporated herein by reference.

57.

Defendant is an "employer," and Plaintiff is a qualified "employee" for purposes of FMLA, 29 U.S.C. § 2601, et seq.

30

58.

Plaintiff was employed by Defendant for over twelve (12) months, having worked at least 1,250 hours in the twelve (12) months before taking leave.

59.

Defendant employs at least fifty (50) employees within 75 miles of Plaintiff's worksite.

60.

Defendant violated the FMLA's retaliation clause when Plaintiff attempted to take medical leave and Defendant refused to allow her to submit a medical leave authorization in violation of the FMLA.

61.

After Plaintiff's hospitalization in 2017, Plaintiff attempted to take medical leave, as evidenced by her text message sent on December 16, 2017; however, she was not advised on her FMLA leave options, rather she was discharged from her employer.

62.

Upon information and belief, Defendant's reasons for discharge are known to be false. Defendant is aware that Plaintiff did not resign, as Plaintiff's text message merely stated she wished to talk about possible resignation.

63.

Defendant also violated the FMLA's interference clause when Defendant interfered with and denied Plaintiff's exercise of her rights under the FMLA.

64.

Plaintiff was entitled to leave under the FMLA based on her serious health condition that made her unable to perform her job with Defendant at that time.

65.

Plaintiff gave proper notice of her intention to take FMLA leave when she sent a text message to Mr. Campbell in December of 2017.

66.

Mr. Campbell was also made aware of Plaintiff's initial medical diagnosis in 2016, as well as through his communication with Plaintiff's family.

67.

Defendant willfully interfered with and denied Plaintiff's benefits to which she is entitled under the FMLA by terminating Plaintiff's employment despite her request for medical leave.

68.

Plaintiff has been prejudiced by Defendant's actions of terminating Plaintiff's employment because Plaintiff's income has dramatically decreased since seeking new employment after her termination.

69.

Plaintiff is entitled to damages from Defendants under the FMLA, including:

a. back pay, including wages and salary, overtime, and benefits;
b. front pay;
c. economic and other compensatory damages;
d. liquidated damages;
e. pre-judgment interest;
f. costs; and
g. attorney's fees

[Doc. No. 7]

At most, it is arguable that ¶ 60 could possibly be construed as background for her

December 2017 claim or as making a claim that Iberia Comprehensive *retaliated* against her by

terminating her in December 2017 because she asked for FMLA leave *in September 2016*, and

32

the Court will address that contention below in the retaliation section of the Ruling. However, Roberson's amended Complaint cannot be construed as making an independent claim for Iberia Comprehensive's alleged interference with her FMLA rights in September 2016.

Nevertheless, even assuming *arguendo* that her amended Complaint could be construed as making an independent claim for interference arising from the alleged September 2016 incident, the Court finds that Roberson has not established a *prima facie* case because she has not shown how she was prejudiced.  Her complaint only alleges that she was prejudiced by any FMLA violations by the termination of her employment in December 2017 [¶ 68].  She had already been released by her doctor, and she did not suffer a demotion or a decrease in pay. Prejudice exists when an employee loses compensation or benefits by reason of the violation or suffers some loss in employment status.  *Jones*, 58 F. Supp 3d. at 669

Therefore, any independent FMLA claim Roberson may be making for the alleged September 2016 interference of her FMLA rights has no merit.  The Court will next address her December 2017 interference claim.

### b.      December 2017 interference claim

Roberson contends that she had a viable right to FMLA leave when she sent a text message to Campbell on Saturday, December 16, 2017, stating she "will be on medical leave effective tomorrow." She states that, despite the text message, Campbell terminated her, thereby interfering with her FMLA rights.

Iberia Comprehensive responds first that Roberson cannot establish a *prima facie* case of interference because she did not appropriately request FMLA leave prior to her separation. Roberson does not dispute that Campbell failed to receive her text requesting leave because he had blocked her after her string of abusive texts; therefore, she was terminated before Campbell

knew of any such request.

Secondly, Iberia Comprehensive contends that, even assuming Roberson can establish a *prima facie* case under the FMLA and, further, assuming Roberson appropriately requested FMLA leave prior to her separation, the evidence nevertheless clearly establishes Iberia Comprehensive separated her not because she requested or would be entitled to a FMLA leave, but rather, because her conduct violated Iberia Comprehensive's conduct and discipline policies. In other words, even if she had requested and received FMLA protected leave, she would have still been terminated, and her FMLA leave would not insulate her from that adverse action. Once Iberia Comprehensive made the decision to terminate Roberson because of her conduct, her FMLA rights were extinguished. Thus, according to Iberia Comprehensive, Roberson cannot maintain a FMLA interference claim against it because Iberia Comprehensive had a legitimate, nondiscriminatory reason unassociated with the FMLA to terminate her.

The Court finds that Roberson has failed to establish a *prima facie* case of interference because she cannot establish that she gave proper notice of her intention to take FMLA leave. She admits she has no proof that her text was delivered, and she does not dispute that Campbell had blocked her abusive texts and did not know about the text until it was shown to him during this litigation.  Her statement in argument that she *assumes* Campbell received the text because he received the texts which she sent the day before, which was prior to his blocking her, is not summary judgment evidence sufficient to establish a genuine issue of material fact.

Additionally, the Court finds that, even if Roberson could establish a *prima facie* case of interference with regard to the December 2017 incident, Iberia Comprehensive has established that it had a legitimate, non-discriminatory reason to terminate her.  Iberia Comprehensive terminated her not because she requested or would be entitled to a FMLA leave, but rather,

because her conduct violated Iberia Comprehensive's conduct and discipline policies.

Roberson has failed to carry her burden of showing pretext. Accordingly, Iberia Comprehensive is entitled to summary judgment on Roberson's FMLA interference claims.

### 2.    Retaliation

The FMLA also "prohibits an employer from discriminating or retaliating against an employee . . . for having exercised or attempted to exercise FMLA rights." 29 C.F.R. §825.220(c).  An employer is further prohibited from discharging or in any other way discriminating against any person . . . for opposing or complaining about any unlawful practice under the [FMLA]." 29 C.F.R. §825.220(a)(2).

An FMLA retaliation claim requires the employee to set out a prima facie case of retaliation that: (1) she engaged in protected activity; (2) the employer took a materially adverse action against her; and (3) a causal link exists between her protected activity and the adverse action. *Rideau*, 381 F.Supp.3d at 709, *citing Wheat v. Florida Parish Juvenile Justice Comm'n*, 811 F.3d 702, 705 (5th Cir. 2016). If this showing is made, the burden then shifts to the employer to proffer a legitimate, non-retaliatory reason for the employment decision; once made, to succeed, the employee must then rebut the employer's reason by showing either the reason is pretext for discrimination or the employer has a retaliatory motive in addition to a legitimate reason, or mixed motives. *Richardson v. Monitronics Int'l, Inc.,* 434 F.3d 327, 333 (5th Cir. 2005). If the employee establishes mixed motives, an employer still may prevail by showing it would have conducted the same employment action regardless of the discriminatory motivation. *Id.*

Iberia Comprehensive contends that Roberson's FMLA retaliation claim fails for the same reason as her FMLA interference claim and her ADA claim. Even assuming Roberson can

establish a *prima facie* case under the FMLA and, further, assuming Roberson appropriately requested FMLA leave prior to her separation, the evidence clearly establishes Iberia Comprehensive separated her not because she requested or would be entitled to a FMLA leave, but rather, because Campbell believed she had resigned and that, even if she had not, her conduct violated Iberia Comprehensive's conduct and discipline policies. In other words, even if she had requested and received FMLA protected leave, she would have still been terminated, and her FMLA leave would not insulate her from that adverse action.

To establish pretext, Roberson responds that Campbell discouraged her from taking FMLA leave in September 2016, and that only one business day passed between Roberson's request for medical leave on December 16, 2017, and her termination on December 19, 2017. She argues that this shows temporal proximity. However, once again, her argument that Campbell received the text wherein she stated her intention to take medical leave is not supported by any evidence, other than her assumption that he received it, even though she admits he had blocked her due to her prior abusive texts.

The Fifth Circuit finds temporal proximity relevant at the pretext stage but "temporal proximity alone cannot create a fact issue of pretext for purposes of summary judgment." *Ralser*, 2015 WL 5321743, at *7. Inconsistencies in an employer's documentation and a suggestion of gross negligence or dishonesty can support a finding of pretext. *Id*.at *7. Ultimately, "the combination of suspicious timing with other significant evidence of pretext, can be sufficient to survive summary judgment." *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398. 409 (5th Cir.1999). The Fifth Circuit will reverse summary judgement if a reasonable jury could conclude that the employer fired the plaintiff in retaliation for her protected activity. *Id*. at 410.

Here, Roberson has offered no inconsistencies in her employer's documentation, no

suggestion of gross negligence or dishonesty, and no other significant evidence of pretext.  Her allegation that Campbell discouraged her from taking FMLA leave in September 2016, has no temporal proximity to her termination in December 2017.  Further, whether she was dissuaded from taking additional leave in 2016 does not relate to whether she was entitled to take leave in December 2017.

As the undisputed facts demonstrate, Campbell did not receive Roberson's request for FMLA before he made the decision to terminate her, he did not know she was hospitalized at the time he accepted her resignation [Doc. No. 27-1, p. 22], and, Roberson would not have been entitled to FMLA leave in December 2017 because the decision had already been made to either accept her resignation per her text, or, alternatively, terminate her based on her inappropriate conduct that violated Iberia Comprehensive's policy.

Accordingly, she has not carried her burden of establishing pretext, and Iberia Comprehensive is entitled to summary judgment on Roberson's FMLA retaliation claim as well.

## III.     CONCLUSION

For the reasons set forth above, Iberia Comprehensive's Motion for Summary Judgment [Doc. No. 25] is GRANTED.   Roberson's claims are DISMISSED WITH PREJUDICE in their entirety.

MONROE, LOUISIANA, this 21st day of April, 2020.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**